NOT RECOMMENDED FOR PUBLICATION
File Name: 14a0480n.06

No. 13-5768

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*Jul 03, 2014*
DEBORAH S. HUNT, Clerk

UNITED STATES OF AMERICA,       )
                                )
    Plaintiff-Appellee,         )
                                )
v.                              )       ON APPEAL FROM THE UNITED
                                )       STATES DISTRICT COURT FOR THE
                                )       EASTERN DISTRICT OF TENNESSEE
ALFRED FORD,                    )
                                )
    Defendant-Appellant.        )

Before: BOGGS and CLAY, Circuit Judges, and COHN, District Judge.[*]

BOGGS, Circuit Judge. Alfred Ford pleaded guilty to one count of possessing a firearm and ammunition as a convicted felon, in violation of 18 U.S.C. § 922(g). The district court sentenced him to 120 months of imprisonment. Ford appeals his sentence, arguing that the district court erred in applying a four-level enhancement under § 2K2.1(b)(6)(B) of the Guidelines for using or possessing a firearm in connection with another felony offense—the offense of felonious assault. In particular, Ford argues that "no testimony or evidence was introduced to support the enhancement by demonstrating that Ford knowingly caused" his supposed victim, Cheryl Billups, "reasonably to fear imminent bodily injury." Appellant's Br. at 13.

---

[*] The Honorable Avern Cohn, United States District Court for the Eastern District of Michigan, sitting by designation.

When Ford argued below that the elements of felonious assault had not been proven, it became incumbent upon the district court to rule on the matter. But the district court never made an express finding on the record that Ford "intentionally or knowingly" caused Billups to "reasonably fear imminent bodily injury," Tenn. Code Ann. § 39-13-101(a)(2), nor is such a conclusion obvious from the record. Accordingly, we vacate Ford's sentence and remand to the district court to make any necessary determinations, explain its rationale, and resentence the defendant accordingly.

## I

In his plea agreement, Ford agreed and stipulated to the following facts, excerpted verbatim: Late on July 4, 2012, the defendant allegedly threatened a victim with a firearm. The police were called, but the defendant left the scene before the Chattanooga Police Department ("CPD") arrived. A few hours later, in the early morning of July 5, 2012, CPD Officer Roth observed the defendant walking down the street. The defendant matched the description of the man who had threatened the previously referenced victim. Officer Roth tried to talk with the defendant, but the defendant kept walking away from him even after being ordered to stop. The defendant walked around a car and eventually complied with Roth's orders. The defendant was drunk. Officer Roth believed he could be the person he was looking for so he re-traced the defendant's path and found a loaded Hi-Point semi-automatic pistol near where Roth first saw the defendant. There was no one else in the area. On July 6, 2012, a CPD Detective and ATF Special Agent Warren Smith interviewed the defendant, who waived his *Miranda* rights. The defendant denied threatening the victim, but he admitted the gun was his. He said he bought it from a "crack head" for $75 and expected to sell it for $150. He admitted he was drunk and had taken an "X Pill" the night that he was arrested. The defendant admits that he possessed the

2

aforementioned firearm and ammunition. The defendant possessed the firearm and ammunition, which were manufactured outside the state of Tennessee and did travel in and affect interstate commerce, after sustaining at least the following felony convictions: Aggravated Assault, Violation of Habitual Traffic Offender. All of these events occurred in the Eastern District of Tennessee.

At Ford's sentencing, the district court applied a four-level enhancement under the Guidelines after concluding that Ford had committed felonious assault earlier that night using the same gun that Roth had recovered.[1] The application of the enhancement was consistent with the recommendation of the probation officer in the pre-sentencing report ("PSR") that was prepared for Ford's sentencing pursuant to Rule 32. Ford disputed the application of the enhancement in part on the ground that he had "never been charged with the alleged felonious assault" and that he had "denied threatening the victim with the weapon." Addendum to PSR at 4 or PSR at 25, Not on docket, Document No. 006111728702. Ford also argued that "one of the elements that must be elicited is that there was fear on behalf of the victim," and that "that element has not been elicited as part of this proof." Ford does not appeal the district court's determination that the same weapon was used in both incidents; rather, he argues, as mentioned earlier, that "no testimony or evidence was introduced to support the enhancement by demonstrating that Ford knowingly caused Billups reasonably to fear imminent bodily injury." Appellant's Br. at 13.

At the sentencing hearing, the government presented testimony from Phillip Narramore, a Chattanooga police officer and ATF task-force officer. Narramore was the ATF agent assigned

---

[1] As the government notes, Appellee's Br. at 6, because § 2K2.1(b)(6)(B) of the Guidelines provides for an enhancement if "any firearm" is used or possessed in connection with another felony offense, the recovered firearm need not be the same as the one used for the assault. Under *United States v. Settle*, 414 F.3d 629, 632–34 (6th Cir. 2005), however, we held that if the firearm is not the same, the government must prove a "clear connection" between the two firearms. Here, the district court found that the recovered firearm was the same as the one used for the assault.

to Ford's case. Although he was not the investigating officer involved with either the call to the police about the alleged assault or the discovery of the defendant and gun in the area a few hours later, Narramore testified that he had spoken to the police officers involved in the arrest and investigation and had reviewed their reports. He testified that on July 4, 2012, around 10:45 PM, Officer Huckaby of the CPD responded to a "threats call" from Cheryl Billups. According to Narramore, "Billups stated that she was at home, and Frado, which would be Alfred Ford, came to her residence and pulled a black pistol on her and asked her where her son was several times, and she said he wasn't here, and that he said that he knew—or her son Joshua would know what this was about." Two and a half hours later, around 1:15 AM, CPD Officer Roth found Ford drunk about one and a half blocks from Billups's home. Roth ordered Ford to come to him. Although Ford initially walked away, behind a car, he eventually acceded to Roth's orders and was "detained." Roth returned to where he had initially seen Ford and recovered a black pistol.

Narramore also testified, in response to questioning from the district court, that, in his experience, people retain possession of their firearms continuously unless they have reason to dispose of them, such as "using a firearm to kill somebody." He further confirmed that, because Ford was a convicted felon, he could not purchase a gun legally, so the "pool of potential suppliers of guns to someone in the defendant's category would be pretty small." As a result, someone like Ford would be particularly unlikely to discard his gun for no reason.

Based on this evidence, and after a discussion of "a series of possibilities" both with regard to a) whether Ford had, in fact, threatened Billups with the gun and b) whether the gun used for the threat was the same as the gun retrieved later that night, the district court concluded as follows:

> Based upon the evidence that the Court has heard, the Court will deny the [defendant's] objection [to the application of the four-point enhancement]. The

4

Court will credit the opinion testimony given by Detective Narramore, who has a wealth of experience in law enforcement with firearms. And based upon his testimony, the Court finds that the gun that the defendant used to threaten the victim was the same gun that he was found with two and a half hours later, 1.5 blocks away from the location where the threat took place. The gun was a pistol in both instances. It was black in both instances. The short time period that's involved here makes it extremely unlikely that the defendant could have acquired another gun. If the defendant had acquired a second gun, the issue comes up what did he do with the first gun. As Detective Narramore testified, convicted felons have a difficult time acquiring guns, and only dispose of guns for some reason. And there has been no reason at all offered at all to explain why this defendant would dispose of the gun. And there is no evidence that the gun had ever been disposed of. It's also extremely unlikely that the defendant would have been able to acquire a second gun within the short time frame that we're talking about, two and a half hours, and within the short distance that we're talking about

The Court also credits the testimony and the information in the presentence report that the defendant was seeking the victim's son because of the thought that the victim's son might be testifying in a case where someone apparently, according to Mr. Poole, had been murdered. So it strikes the Court that under those circumstances it is likely that the defendant was still on the lookout for the son, and would want to be able to persuade the son to not testify and cooperate with law enforcement if he encountered the son. The son's mother was there, the defendant was still in the location, so if the son had come back or come around the house, the defendant would have been in a position to confront the son and persuade the son that he not cooperate. And the best way of persuasion would be a gun. Therefore the Court concludes that the presentence report is correct on this point, and the Court will deny the defendant's motion on this point.

## II

"Federal Rule of Criminal Procedure 32(i)(3)(B) requires the district court at sentencing to rule on 'any disputed portion of the presentence report or other controverted matter.'" *United States v. White*, 492 F.3d 380, 415 (6th Cir. 2007). "Once the defendant calls the matter to the court's attention, the court may not merely summarily adopt the factual findings in the presentence report or simply declare that the facts are supported by a preponderance of the evidence." *Ibid.* (quotation marks omitted). "Rather, the district court must affirmatively rule on a controverted matter where it could potentially impact the defendant's sentence." *Ibid.* "[W]e

5

require literal compliance with this Rule for a variety of reasons, such as enhancing the accuracy of the sentence and the clarity of the record." *Ibid.* (quotation marks omitted). In making its factual determinations for sentencing purposes, the district court "may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a). Provided the district court has made the requisite factual findings in compliance with Rule 32(i)(3)(B), we will review those factual findings for clear error. *United States v. Kosinski*, 480 F.3d 769, 774 (6th Cir. 2007).

Here, the district court does not appear to have affirmatively and expressly found, based on its review of the evidence, that Ford "intentionally or knowingly caused" the victim to "reasonably fear imminent bodily injury"—required elements of felonious assault under Tennessee law. Tenn. Code Ann. § 39-13-101(a)(2). As mentioned, during the sentencing hearing, Ford's attorney noted that "one of the elements that must be elicited is that there was fear on behalf of the victim. And the testimony has been, from the detective and the other materials, that that element has not been elicited as part of this proof as well." At that point, it became incumbent upon the court to "affirmatively rule" on the "controverted matter," i.e. whether there was sufficient evidence in the record from which to conclude that Ford had assaulted Billups. But the court appears to have continued along its previous line of inquiry concerning the intimidation of witnesses. To Ford's objection that proof of the assault on Billups was lacking, the court responded: "And I don't know if this is true, Mr. von Kessler [Ford's attorney], since we do things very differently in federal court, but I think I've seen in the newspapers and perhaps on television that in some communities there is a very, very serious problem with witnesses to crimes not cooperating with the authorities . . . ."

6

Some evidence in the record may support the court's determination that Ford had committed felonious assault. For example, Narramore testified that in Billups's call to the police, she allegedly stated that Ford "came to her residence and pulled a black pistol on her and asked her where her son was several times." Such testimony may support, though it does not compel, the inference that a reasonable person in Billups's position would have feared imminent bodily harm, and that therefore Billups likely feared the same. *See* Appellee's Br. at 14 (arguing that "any rational person in Ms. Billups's situation would have been afraid for her life, as reflected by her prompt report to the police"). It may also support the inference that, in showing up at the door with his gun drawn and demanding to see Billups's son, Ford knowingly caused such fear.

On the other hand, in his account of the call to the police, Narramore makes no reference to any expression of fear on Billups's part. The focus of the district court's discussion of the assault was a) whether Ford approached Billups with the same weapon that he admitted to possessing later that night and b) whether it was likely that Ford intended to intimidate Billups's *son* so as to dissuade him from testifying as a witness. The court stated: "Well, let's assume that the presentence report is correct, then, in that statement, that the motivation behind the defendant approaching the victim and sticking a gun in her face was so that he could locate the victim's son and use whatever persuasive powers he had to convince the victim's son to not testify against someone." The court went on to emphasize "that in some communities there is a very, very serious problem with witnesses to crimes not cooperating with the authorities." And in its ruling on the issue, the court observed, "if the son had come back or come around the house, the defendant would have been in a position to confront the son and persuade the son that he not cooperate. And the best way of persuasion would be a gun." But there is no discussion of

7

whether Ford intentionally or knowingly intimidated *Billups* (the purported victim of the alleged assault); whether she in fact feared bodily harm; or whether, if so, she feared that such harm was "imminent." Nor can we say that such a conclusion, though plausible, is obvious under the circumstances, given that Ford denied threatening Billups, that he apparently left her residence (though remained in the area) after he was unable to locate Billups's son, and that the government did not introduce any testimony from Billups or anyone else directly involved in the incident to support the inference that she feared imminent bodily harm.[2]

To be sure, the government is correct that "a victim's unavailability does not bar the imposition of a § 2K2.1(b)(6)(B) enhancement so long as reliable evidence, such as a 911 call or police report, supplies the requisite facts." Appellee's Br. at 14 (citing *United States v. Johnson*, 495 F. App'x 573 (6th Cir. 2012) (per curiam). But here, such other evidence appears to be lacking. Whether the district court could infer that Ford was guilty of felonious assault would likely depend on the nature of the threat. For example, if the evidence revealed that Ford had said, "Tell me where your son is or I'll kill you," the court might infer that Billups reasonably feared imminent bodily injury. On the other hand, had Ford merely demanded to see Billups's son, or had he merely told her to pass the threat along, such an inference might not be warranted. The sentencing transcript, however, gives little indication as to which of these scenarios was more likely. And while the court's focus was on Ford's alleged attempt to threaten Billups's son, such a threat, too, would appear to lack the element of imminence required for the crime of assault.[3]

---

[2] Narramore testified that he "call[ed] Ms. Billups several times" on the day before sentencing but "was not able to get in touch with her."

[3] To conclude that Ford committed attempted assault against Billups's son, the court would have to find that Billups's son would have feared imminent bodily harm, as opposed to future harm had he chosen to testify.

It is worth noting that Ford's conduct might more appropriately be characterized as attempting to influence a witness to withhold truthful testimony, in violation of Tennessee Code Annotated § 39-16-507. Although the facts might not support the conclusion that Ford intentionally or knowingly caused Billups to reasonably fear imminent bodily harm, they might support the alternative finding that Ford attempted to use physical force to induce Billups's son to withhold testimony. Such a finding would seem to warrant the application of the enhancement for use of a firearm in connection with "another felony offense." *See* U.S.S.G. 2K2.1(b)(6)(B) & Application Note 14(C) (defining "another felony offense," in relevant part, as "any federal, state, or local offense . . . punishable by imprisonment for a term exceeding one year, regardless of whether a criminal charge was brought, or a conviction obtained"); *see also* Tenn. Code Ann. § 39-16-507 (classifying "[a] violation of this section" as "a Class D felony") and Tenn. Code Ann. § 40-35-112 (indicating that a Class D felony is punishable by not less than two nor more than twelve years in prison).

In any event, the district court should not have applied the enhancement for felonious assault—at least not without expressly finding that all of the elements of the offense were met. Because the district court did not expressly determine that Ford knowingly or intentionally caused Billups to fear imminent bodily harm, we vacate Ford's sentence and remand to the district court for resentencing.

9